(Slip Opinion) OCTOBER TERM, 2016 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## PENA-RODRIGUEZ *v.* COLORADO

### CERTIORARI TO THE SUPREME COURT OF COLORADO

No. 15–606.   Argued October 11, 2016—Decided March 6, 2017

A Colorado jury convicted petitioner Peña-Rodriguez of harassment and unlawful sexual contact.  Following the discharge of the jury, two jurors told defense counsel that, during deliberations, Juror H. C. had expressed anti-Hispanic bias toward petitioner and petitioner's alibi witness.  Counsel, with the trial court's supervision, obtained affidavits from the two jurors describing a number of biased statements by H. C.  The court acknowledged H. C.'s apparent bias but denied petitioner's motion for a new trial on the ground that Colorado Rule of Evidence 606(b) generally prohibits a juror from testifying as to statements made during deliberations in a proceeding inquiring into the validity of the verdict.  The Colorado Court of Appeals affirmed, agreeing that H. C.'s alleged statements did not fall within an exception to Rule 606(b).  The Colorado Supreme Court also affirmed, relying on *Tanner* v. *United States*, 483 U. S. 107, and *Warger* v. *Shauers*, 574 U. S. ___, both of which rejected constitutional challenges to the federal no-impeachment rule as applied to evidence of juror misconduct or bias.

*Held*: Where a juror makes a clear statement indicating that he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee. Pp. 6–21.

   (a) At common law jurors were forbidden to impeach their verdict, either by affidavit or live testimony.  Some American jurisdictions adopted a more flexible version of the no-impeachment bar, known as the "Iowa rule," which prevented jurors from testifying only about their own subjective beliefs, thoughts, or motives during deliberations.  An alternative approach, later referred to as the federal ap-

proach, permitted an exception only for events extraneous to the deliberative process. This Court's early decisions did not establish a clear preference for a particular version of the no-impeachment rule, appearing open to the Iowa rule in *United States* v. *Reid*, 12 How. 361, and *Mattox* v. *United States*, 146 U. S. 140, but rejecting that approach in *McDonald* v. *Pless*, 238 U. S. 264.

The common-law development of the rule reached a milestone in 1975 when Congress adopted Federal Rule of Evidence 606(b), which sets out a broad no-impeachment rule, with only limited exceptions. This version of the no-impeachment rule has substantial merit, promoting full and vigorous discussion by jurors and providing considerable assurance that after being discharged they will not be summoned to recount their deliberations or otherwise harassed. The rule gives stability and finality to verdicts. Pp. 6–9.

(b) Some version of the no-impeachment rule is followed in every State and the District of Columbia, most of which follow the Federal Rule. At least 16 jurisdictions have recognized an exception for juror testimony about racial bias in deliberations. Three Federal Courts of Appeals have also held or suggested there is a constitutional exception for evidence of racial bias.

In addressing the common-law no-impeachment rule, this Court noted the possibility of an exception in the "gravest and most important cases." *United States* v. *Reid*, *supra,* at 366; *McDonald* v. *Pless*, *supra,* at 269. The Court has addressed the question whether the Constitution mandates an exception to Rule 606(b) just twice, rejecting an exception each time. In *Tanner,* where the evidence showed that some jurors were under the influence of drugs and alcohol during the trial, the Court identified "long-recognized and very substantial concerns" supporting the no-impeachment rule. 483 U. S., at 127. The Court also outlined existing, significant safeguards for the defendant's right to an impartial and competent jury beyond post-trial juror testimony: members of the venire can be examined for impartiality during *voir dire*; juror misconduct may be observed the court, counsel, and court personnel during the trial; and jurors themselves can report misconduct to the court before a verdict is rendered. In *Warger*, a civil case where the evidence indicated that the jury forewoman failed to disclose a prodefendant bias during *voir dire*, the Court again put substantial reliance on existing safeguards for a fair trial. But the Court also warned, as in *Reid* and *McDonald,* that the no-impeachment rule may admit of exceptions for "juror bias so extreme that, almost by definition, the jury trial right has been abridged." 574 U. S., at ___–___, n. 3. *Reid*, *McDonald*, and *Warger* left open the question here: whether the Constitution requires an exception to the no-impeachment rule when a juror's statements indi-

cate that racial animus was a significant motivating factor in his or her finding of guilt. Pp. 9–13.

(c) The imperative to purge racial prejudice from the administration of justice was given new force and direction by the ratification of the Civil War Amendments. "[T]he central purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from official sources in the States." *McLaughlin* v. *Florida*, 379 U. S. 184, 192. Time and again, this Court has enforced the Constitution's guarantee against state-sponsored racial discrimination in the jury system. The Court has interpreted the Fourteenth Amendment to prohibit the exclusion of jurors based on race, *Strauder* v. *West Virginia*, 100 U. S. 303, 305–309; struck down laws and practices that systematically exclude racial minorities from juries, see, *e.g., Neal* v. *Delaware*, 103 U. S. 370; ruled that no litigant may exclude a prospective juror based on race, see, *e.g., Batson* v. *Kentucky*, 476 U. S. 79; and held that defendants may at times be entitled to ask about racial bias during *voir dire,* see, *e.g., Ham* v. *South Carolina*, 409 U. S. 524. The unmistakable principle of these precedents is that discrimination on the basis of race, "odious in all aspects, is especially pernicious in the administration of justice," *Rose* v. *Mitchell*, 443 U. S. 545, 555, damaging "both the fact and the perception" of the jury's role as "a vital check against the wrongful exercise of power by the State," *Powers* v. *Ohio*, 499 U. S. 400, 411. Pp. 13–15.

(d) This case lies at the intersection of the Court's decisions endorsing the no-impeachment rule and those seeking to eliminate racial bias in the jury system. Those lines of precedent need not conflict. Racial bias, unlike the behavior in *McDonald*, *Tanner*, or *Warger,* implicates unique historical, constitutional, and institutional concerns and, if left unaddressed, would risk systemic injury to the administration of justice. It is also distinct in a pragmatic sense, for the *Tanner* safeguards may be less effective in rooting out racial bias. But while all forms of improper bias pose challenges to the trial process, there is a sound basis to treat racial bias with added precaution. A constitutional rule that racial bias in the justice system must be addressed—including, in some instances, after a verdict has been entered—is necessary to prevent a systemic loss of confidence in jury verdicts, a confidence that is a central premise of the Sixth Amendment trial right. Pp. 15–17.

(e) Before the no-impeachment bar can be set aside to allow further judicial inquiry, there must be a threshold showing that one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict. To qualify, the statement must tend to show that racial animus was a significant motivating factor in the juror's vote

Syllabus

to convict. Whether the threshold showing has been satisfied is committed to the substantial discretion of the trial court in light of all the circumstances, including the content and timing of the alleged statements and the reliability of the proffered evidence.

The practical mechanics of acquiring and presenting such evidence will no doubt be shaped and guided by state rules of professional ethics and local court rules, both of which often limit counsel's post-trial contact with jurors. The experience of those jurisdictions that have already recognized a racial-bias exception to the no-impeachment rule, and the experience of courts going forward, will inform the proper exercise of trial judge discretion. The Court need not address what procedures a trial court must follow when confronted with a motion for a new trial based on juror testimony of racial bias or the appropriate standard for determining when such evidence is sufficient to require that the verdict be set aside and a new trial be granted. Standard and existing safeguards may also help prevent racial bias in jury deliberations, including careful *voir dire* and a trial court's instructions to jurors about their duty to review the evidence, deliberate together, and reach a verdict in a fair and impartial way, free from bias of any kind. Pp. 17–21.

350 P. 3d 287, reversed and remanded.

KENNEDY, J., delivered the opinion of the Court, in which GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. THOMAS, J., filed a dissenting opinion. ALITO, J., filed a dissenting opinion, in which ROBERTS, C. J., and THOMAS, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 15–606

## MIGUEL ANGEL PENA-RODRIGUEZ, PETITIONER *v.* COLORADO

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF COLORADO

[March 6, 2017]

JUSTICE KENNEDY delivered the opinion of the Court.

The jury is a central foundation of our justice system and our democracy. Whatever its imperfections in a particular case, the jury is a necessary check on governmental power. The jury, over the centuries, has been an inspired, trusted, and effective instrument for resolving factual disputes and determining ultimate questions of guilt or innocence in criminal cases. Over the long course its judgments find acceptance in the community, an acceptance essential to respect for the rule of law. The jury is a tangible implementation of the principle that the law comes from the people.

In the era of our Nation's founding, the right to a jury trial already had existed and evolved for centuries, through and alongside the common law. The jury was considered a fundamental safeguard of individual liberty. See The Federalist No. 83, p. 451 (B. Warner ed. 1818) (A. Hamilton). The right to a jury trial in criminal cases was part of the Constitution as first drawn, and it was restated in the Sixth Amendment. Art. III, §2, cl. 3; Amdt. 6. By operation of the Fourteenth Amendment, it is applicable to

the States. *Duncan* v. *Louisiana*, 391 U. S. 145, 149–150 (1968).

Like all human institutions, the jury system has its flaws, yet experience shows that fair and impartial verdicts can be reached if the jury follows the court's instructions and undertakes deliberations that are honest, candid, robust, and based on common sense. A general rule has evolved to give substantial protection to verdict finality and to assure jurors that, once their verdict has been entered, it will not later be called into question based on the comments or conclusions they expressed during deliberations. This principle, itself centuries old, is often referred to as the no-impeachment rule. The instant case presents the question whether there is an exception to the no-impeachment rule when, after the jury is discharged, a juror comes forward with compelling evidence that another juror made clear and explicit statements indicating that racial animus was a significant motivating factor in his or her vote to convict.

I

State prosecutors in Colorado brought criminal charges against petitioner, Miguel Angel Peña-Rodriguez, based on the following allegations. In 2007, in the bathroom of a Colorado horse-racing facility, a man sexually assaulted two teenage sisters. The girls told their father and identified the man as an employee of the racetrack. The police located and arrested petitioner. Each girl separately identified petitioner as the man who had assaulted her.

The State charged petitioner with harassment, unlawful sexual contact, and attempted sexual assault on a child. Before the jury was empaneled, members of the venire were repeatedly asked whether they believed that they could be fair and impartial in the case. A written questionnaire asked if there was "anything about you that you feel would make it difficult for you to be a fair juror." App.

14. The court repeated the question to the panel of prospective jurors and encouraged jurors to speak in private with the court if they had any concerns about their impartiality. Defense counsel likewise asked whether anyone felt that "this is simply not a good case" for them to be a fair juror. *Id.,* at 34. None of the empaneled jurors expressed any reservations based on racial or any other bias. And none asked to speak with the trial judge.

After a 3-day trial, the jury found petitioner guilty of unlawful sexual contact and harassment, but it failed to reach a verdict on the attempted sexual assault charge. When the jury was discharged, the court gave them this instruction, as mandated by Colorado law:

> "The question may arise whether you may now discuss this case with the lawyers, defendant, or other persons. For your guidance the court instructs you that whether you talk to anyone is entirely your own decision. . . . If any person persists in discussing the case over your objection, or becomes critical of your service either before or after any discussion has begun, please report it to me." *Id.,* at 85–86.

Following the discharge of the jury, petitioner's counsel entered the jury room to discuss the trial with the jurors. As the room was emptying, two jurors remained to speak with counsel in private. They stated that, during deliberations, another juror had expressed anti-Hispanic bias toward petitioner and petitioner's alibi witness. Petitioner's counsel reported this to the court and, with the court's supervision, obtained sworn affidavits from the two jurors.

The affidavits by the two jurors described a number of biased statements made by another juror, identified as Juror H. C. According to the two jurors, H. C. told the other jurors that he "believed the defendant was guilty because, in [H. C.'s] experience as an ex-law enforcement officer, Mexican men had a bravado that caused them to

believe they could do whatever they wanted with women." *Id.*, at 110. The jurors reported that H. C. stated his belief that Mexican men are physically controlling of women because of their sense of entitlement, and further stated, "'I think he did it because he's Mexican and Mexican men take whatever they want.'" *Id.,* at 109. According to the jurors, H. C. further explained that, in his experience, "nine times out of ten Mexican men were guilty of being aggressive toward women and young girls." *Id.,* at 110. Finally, the jurors recounted that Juror H. C. said that he did not find petitioner's alibi witness credible because, among other things, the witness was "'an illegal.'" *Ibid.* (In fact, the witness testified during trial that he was a legal resident of the United States.)

After reviewing the affidavits, the trial court acknowledged H. C.'s apparent bias. But the court denied petitioner's motion for a new trial, noting that "[t]he actual deliberations that occur among the jurors are protected from inquiry under [Colorado Rule of Evidence] 606(b)." *Id.*, at 90. Like its federal counterpart, Colorado's Rule 606(b) generally prohibits a juror from testifying as to any statement made during deliberations in a proceeding inquiring into the validity of the verdict. See Fed. Rule Evid. 606(b). The Colorado Rule reads as follows:

> "(b) Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jurors' attention, (2) whether any out-

side influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form. A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying." Colo. Rule Evid. 606(b) (2016).

The verdict deemed final, petitioner was sentenced to two years' probation and was required to register as a sex offender. A divided panel of the Colorado Court of Appeals affirmed petitioner's conviction, agreeing that H. C.'s alleged statements did not fall within an exception to Rule 606(b) and so were inadmissible to undermine the validity of the verdict. ___ P. 3d ___, 2012 WL 5457362.

The Colorado Supreme Court affirmed by a vote of 4 to 3. 350 P. 3d 287 (2015). The prevailing opinion relied on two decisions of this Court rejecting constitutional challenges to the federal no-impeachment rule as applied to evidence of juror misconduct or bias. See *Tanner* v. *United States*, 483 U. S. 107 (1987); *Warger* v. *Shauers*, 574 U. S. ___ (2014). After reviewing those precedents, the court could find no "dividing line between different *types* of juror bias or misconduct," and thus no basis for permitting impeachment of the verdicts in petitioner's trial, notwithstanding H. C.'s apparent racial bias. 350 P. 3d, at 293. This Court granted certiorari to decide whether there is a constitutional exception to the no-impeachment rule for instances of racial bias. 578 U. S. ___ (2016).

Juror H. C.'s bias was based on petitioner's Hispanic identity, which the Court in prior cases has referred to as ethnicity, and that may be an instructive term here. See, *e.g., Hernandez* v. *New York*, 500 U. S. 352, 355 (1991) (plurality opinion). Yet we have also used the language of race when discussing the relevant constitutional principles in cases involving Hispanic persons. See, *e.g., ibid.*; *Fisher*

v. *University of Tex. at Austin*, 570 U. S. ___ (2013); *Rosales-Lopez* v. *United States*, 451 U. S. 182, 189–190 (1981) (plurality opinion). Petitioner and respondent both refer to race, or to race and ethnicity, in this more expansive sense in their briefs to the Court. This opinion refers to the nature of the bias as racial in keeping with the primary terminology employed by the parties and used in our precedents.

## II

### A

At common law jurors were forbidden to impeach their verdict, either by affidavit or live testimony. This rule originated in *Vaise* v. *Delaval*, 1 T. R. 11, 99 Eng. Rep. 944 (K. B. 1785). There, Lord Mansfield excluded juror testimony that the jury had decided the case through a game of chance. The Mansfield rule, as it came to be known, prohibited jurors, after the verdict was entered, from testifying either about their subjective mental processes or about objective events that occurred during deliberations.

American courts adopted the Mansfield rule as a matter of common law, though not in every detail. Some jurisdictions adopted a different, more flexible version of the no-impeachment bar known as the "Iowa rule." Under that rule, jurors were prevented only from testifying about their own subjective beliefs, thoughts, or motives during deliberations. See *Wright* v. *Illinois & Miss. Tel. Co.*, 20 Iowa 195 (1866). Jurors could, however, testify about objective facts and events occurring during deliberations, in part because other jurors could corroborate that testimony.

An alternative approach, later referred to as the federal approach, stayed closer to the original Mansfield rule. See *Warger*, *supra*, at ___ (slip op., at 5). Under this version of the rule, the no-impeachment bar permitted an exception only for testimony about events extraneous to the deliber-

ative process, such as reliance on outside evidence—
newspapers, dictionaries, and the like—or personal inves-
tigation of the facts.

This Court's early decisions did not establish a clear
preference for a particular version of the no-impeachment
rule. In *United States* v. *Reid*, 12 How. 361 (1852), the
Court appeared open to the admission of juror testimony
that the jurors had consulted newspapers during delibera-
tions, but in the end it barred the evidence because the
newspapers "had not the slightest influence" on the ver-
dict. *Id.,* at 366. The *Reid* Court warned that juror testi-
mony "ought always to be received with great caution."
*Ibid.* Yet it added an important admonition: "cases might
arise in which it would be impossible to refuse" juror
testimony "without violating the plainest principles of
justice." *Ibid.*

In a following case the Court required the admission of
juror affidavits stating that the jury consulted information
that was not in evidence, including a prejudicial news-
paper article. *Mattox* v. *United States*, 146 U. S. 140, 151
(1892). The Court suggested, furthermore, that the ad-
mission of juror testimony might be governed by a more
flexible rule, one permitting jury testimony even where it
did not involve consultation of prejudicial extraneous
information. *Id.,* at 148–149; see also *Hyde* v. *United
States*, 225 U. S. 347, 382–384 (1912) (stating that the
more flexible Iowa rule "should apply," but excluding
evidence that the jury reached the verdict by trading
certain defendants' acquittals for others' convictions).

Later, however, the Court rejected the more lenient
Iowa rule. In *McDonald* v. *Pless*, 238 U. S. 264 (1915), the
Court affirmed the exclusion of juror testimony about
objective events in the jury room. There, the jury allegedly
had calculated a damages award by averaging the
numerical submissions of each member. *Id.,* at 265–266.
As the Court explained, admitting that evidence would

have "dangerous consequences": "no verdict would be safe" and the practice would "open the door to the most perni- cious arts and tampering with jurors." *Id.*, at 268 (inter- nal quotation marks omitted). Yet the Court reiterated its admonition from *Reid*, again cautioning that the no- impeachment rule might recognize exceptions "in the gravest and most important cases" where exclusion of juror affidavits might well violate "the plainest principles of justice." 238 U. S*.,* at 269 (quoting *Reid*, *supra*, at 366; internal quotation marks omitted).

The common-law development of the no-impeachment rule reached a milestone in 1975, when Congress adopted the Federal Rules of Evidence, including Rule 606(b). Congress, like the *McDonald* Court, rejected the Iowa rule. Instead it endorsed a broad no-impeachment rule, with only limited exceptions.

The version of the rule that Congress adopted was "no accident." *Warger*, 574 U. S., at ___ (slip op., at 7). The Advisory Committee at first drafted a rule reflecting the Iowa approach, prohibiting admission of juror testimony only as it related to jurors' mental processes in reaching a verdict. The Department of Justice, however, expressed concern over the preliminary rule. The Advisory Commit- tee then drafted the more stringent version now in effect, prohibiting all juror testimony, with exceptions only where the jury had considered prejudicial extraneous evidence or was subject to other outside influence. Rules of Evidence for United States Courts and Magistrates, 56 F. R. D. 183, 265 (1972). The Court adopted this second version and transmitted it to Congress.

The House favored the Iowa approach, but the Senate expressed concern that it did not sufficiently address the public policy interest in the finality of verdicts. S. Rep. No. 93–1277, pp. 13–14 (1974). Siding with the Senate, the Conference Committee adopted, Congress enacted, and the President signed the Court's proposed rule. The sub-

stance of the Rule has not changed since 1975, except for a 2006 modification permitting evidence of a clerical mistake on the verdict form. See 574 U. S., at \_\_\_.

The current version of Rule 606(b) states as follows:

"(1) *Prohibited Testimony or Other Evidence.* During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

"(2) *Exceptions.* A juror may testify about whether:

"(A) extraneous prejudicial information was improperly brought to the jury's attention;

"(B) an outside influence was improperly brought to bear on any juror; or

"(C) a mistake was made in entering the verdict on the verdict form."

This version of the no-impeachment rule has substantial merit. It promotes full and vigorous discussion by providing jurors with considerable assurance that after being discharged they will not be summoned to recount their deliberations, and they will not otherwise be harassed or annoyed by litigants seeking to challenge the verdict. The rule gives stability and finality to verdicts.

B

Some version of the no-impeachment rule is followed in every State and the District of Columbia. Variations make classification imprecise, but, as a general matter, it appears that 42 jurisdictions follow the Federal Rule, while 9 follow the Iowa Rule. Within both classifications there is a diversity of approaches. Nine jurisdictions that

follow the Federal Rule have codified exceptions other than those listed in Federal Rule 606(b). See Appendix, *infra*. At least 16 jurisdictions, 11 of which follow the Federal Rule, have recognized an exception to the no-impeachment bar under the circumstances the Court faces here: juror testimony that racial bias played a part in deliberations. *Ibid.* According to the parties and *amici*, only one State other than Colorado has addressed this issue and declined to recognize an exception for racial bias. See *Commonwealth* v. *Steele*, 599 Pa. 341, 377–379, 961 A. 2d 786, 807–808 (2012).

The federal courts, for their part, are governed by Federal Rule 606(b), but their interpretations deserve further comment. Various Courts of Appeals have had occasion to consider a racial bias exception and have reached different conclusions. Three have held or suggested there is a constitutional exception for evidence of racial bias. See *United States* v. *Villar*, 586 F. 3d 76, 87–88 (CA1 2009) (holding the Constitution demands a racial-bias exception); *United States* v. *Henley*, 238 F. 3d 1111, 1119–1121 (CA9 2001) (finding persuasive arguments in favor of an exception but not deciding the issue); *Shillcutt* v. *Gagnon*, 827 F. 2d 1155, 1158–1160 (CA7 1987) (observing that in some cases fundamental fairness could require an exception). One Court of Appeals has declined to find an exception, reasoning that other safeguards inherent in the trial process suffice to protect defendants' constitutional interests. See *United States* v. *Benally*, 546 F. 3d 1230, 1240–1241 (CA10 2008). Another has suggested as much, holding in the habeas context that an exception for racial bias was not clearly established but indicating in dicta that no such exception exists. See *Williams* v. *Price*, 343 F. 3d 223, 237–239 (CA3 2003) (Alito, J.). And one Court of Appeals has held that evidence of racial bias is excluded by Rule 606(b), without addressing whether the Constitution may at times demand an exception. See *Martinez* v.

*Food City, Inc.*, 658 F. 2d 369, 373–374 (CA5 1981).

C

In addressing the scope of the common-law no-impeachment rule before Rule 606(b)'s adoption, the *Reid* and *McDonald* Courts noted the possibility of an exception to the rule in the "gravest and most important cases." *Reid*, 12 How., at 366; *McDonald*, 238 U. S., at 269. Yet since the enactment of Rule 606(b), the Court has addressed the precise question whether the Constitution mandates an exception to it in just two instances.

In its first case, *Tanner*, 483 U. S. 107, the Court rejected a Sixth Amendment exception for evidence that some jurors were under the influence of drugs and alcohol during the trial. *Id.*, at 125. Central to the Court's reasoning were the "long-recognized and very substantial concerns" supporting "the protection of jury deliberations from intrusive inquiry." *Id.,* at 127. The *Tanner* Court echoed *McDonald*'s concern that, if attorneys could use juror testimony to attack verdicts, jurors would be "harassed and beset by the defeated party," thus destroying "all frankness and freedom of discussion and conference." 483 U. S., at 120 (quoting *McDonald*, *supra,* at 267–268). The Court was concerned, moreover, that attempts to impeach a verdict would "disrupt the finality of the process" and undermine both "jurors' willingness to return an unpopular verdict" and "the community's trust in a system that relies on the decisions of laypeople." 483 U. S., at 120–121.

The *Tanner* Court outlined existing, significant safeguards for the defendant's right to an impartial and competent jury beyond post-trial juror testimony. At the outset of the trial process, *voir dire* provides an opportunity for the court and counsel to examine members of the venire for impartiality. As a trial proceeds, the court, counsel, and court personnel have some opportunity to

learn of any juror misconduct. And, before the verdict, jurors themselves can report misconduct to the court. These procedures do not undermine the stability of a verdict once rendered. Even after the trial, evidence of misconduct other than juror testimony can be used to attempt to impeach the verdict. *Id.,* at 127. Balancing these interests and safeguards against the defendant's Sixth Amendment interest in that case, the Court affirmed the exclusion of affidavits pertaining to the jury's inebriated state. *Ibid.*

The second case to consider the general issue presented here was *Warger*, 574 U. S. ___. The Court again rejected the argument that, in the circumstances there, the jury trial right required an exception to the no-impeachment rule. *Warger* involved a civil case where, after the verdict was entered, the losing party sought to proffer evidence that the jury forewoman had failed to disclose prodefendant bias during *voir dire*. As in *Tanner*, the Court put substantial reliance on existing safeguards for a fair trial. The Court stated: "Even if jurors lie in *voir dire* in a way that conceals bias, juror impartiality is adequately assured by the parties' ability to bring to the court's attention any evidence of bias before the verdict is rendered, and to employ nonjuror evidence even after the verdict is rendered." 574 U. S., at ___ (slip op., at 10).

In *Warger*, however, the Court did reiterate that the no-impeachment rule may admit exceptions. As in *Reid* and *McDonald*, the Court warned of "juror bias so extreme that, almost by definition, the jury trial right has been abridged." 574 U. S., at ___–___, n. 3 (slip op., at 10–11, n. 3). "If and when such a case arises," the Court indicated it would "consider whether the usual safeguards are or are not sufficient to protect the integrity of the process." *Ibid.*

The recognition in *Warger* that there may be extreme cases where the jury trial right requires an exception to

the no-impeachment rule must be interpreted in context as a guarded, cautious statement. This caution is warranted to avoid formulating an exception that might undermine the jury dynamics and finality interests the no-impeachment rule seeks to protect. Today, however, the Court faces the question that *Reid*, *McDonald*, and *Warger* left open. The Court must decide whether the Constitution requires an exception to the no-impeachment rule when a juror's statements indicate that racial animus was a significant motivating factor in his or her finding of guilt.

## III

It must become the heritage of our Nation to rise above racial classifications that are so inconsistent with our commitment to the equal dignity of all persons. This imperative to purge racial prejudice from the administration of justice was given new force and direction by the ratification of the Civil War Amendments.

"[T]he central purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from official sources in the States." *McLaughlin* v. *Florida*, 379 U. S. 184, 192 (1964). In the years before and after the ratification of the Fourteenth Amendment, it became clear that racial discrimination in the jury system posed a particular threat both to the promise of the Amendment and to the integrity of the jury trial. "Almost immediately after the Civil War, the South began a practice that would continue for many decades: All-white juries punished black defendants particularly harshly, while simultaneously refusing to punish violence by whites, including Ku Klux Klan members, against blacks and Republicans." Forman, Juries and Race in the Nineteenth Century, 113 Yale L. J. 895, 909–910 (2004). To take one example, just in the years 1865 and 1866, all-white juries in Texas decided a total of 500 prosecutions of white defendants

charged with killing African-Americans. All 500 were acquitted. *Id.,* at 916. The stark and unapologetic nature of race-motivated outcomes challenged the American belief that "the jury was a bulwark of liberty," *id.,* at 909, and prompted Congress to pass legislation to integrate the jury system and to bar persons from eligibility for jury service if they had conspired to deny the civil rights of African-Americans, *id.,* at 920–930. Members of Congress stressed that the legislation was necessary to preserve the right to a fair trial and to guarantee the equal protection of the laws. *Ibid.*

The duty to confront racial animus in the justice system is not the legislature's alone. Time and again, this Court has been called upon to enforce the Constitution's guarantee against state-sponsored racial discrimination in the jury system. Beginning in 1880, the Court interpreted the Fourteenth Amendment to prohibit the exclusion of jurors on the basis of race. *Strauder* v. *West Virginia*, 100 U. S. 303, 305–309 (1880). The Court has repeatedly struck down laws and practices that systematically exclude racial minorities from juries. See, *e.g., Neal* v. *Delaware*, 103 U. S. 370 (1881); *Hollins* v. *Oklahoma*, 295 U. S. 394 (1935) (*per curiam*); *Avery* v. *Georgia*, 345 U. S. 559 (1953); *Hernandez* v. *Texas*, 347 U. S. 475 (1954); *Castaneda* v. *Partida*, 430 U. S. 482 (1977). To guard against discrimination in jury selection, the Court has ruled that no litigant may exclude a prospective juror on the basis of race. *Batson* v. *Kentucky*, 476 U. S. 79 (1986); *Edmonson* v. *Leesville Concrete Co.*, 500 U. S. 614 (1991); *Georgia* v. *McCollum*, 505 U. S. 42 (1992). In an effort to ensure that individuals who sit on juries are free of racial bias, the Court has held that the Constitution at times demands that defendants be permitted to ask questions about racial bias during *voir dire*. *Ham* v. *South Carolina*, 409 U. S. 524 (1973); *Rosales-Lopez*, 451 U. S. 182; *Turner* v. *Murray*, 476 U. S. 28 (1986).

The unmistakable principle underlying these precedents is that discrimination on the basis of race, "odious in all aspects, is especially pernicious in the administration of justice." *Rose* v. *Mitchell*, 443 U. S. 545, 555 (1979). The jury is to be "a criminal defendant's fundamental 'protection of life and liberty against race or color prejudice.'" *McCleskey* v. *Kemp*, 481 U. S. 279, 310 (1987) (quoting *Strauder*, *supra*, at 309). Permitting racial prejudice in the jury system damages "both the fact and the perception" of the jury's role as "a vital check against the wrongful exercise of power by the State." *Powers* v. *Ohio*, 499 U. S. 400, 411 (1991); cf. *Aldridge* v. *United States*, 283 U. S. 308, 315 (1931); *Buck* v. *Davis*, *ante,* at 22.

### IV
### A

This case lies at the intersection of the Court's decisions endorsing the no-impeachment rule and its decisions seeking to eliminate racial bias in the jury system. The two lines of precedent, however, need not conflict.

Racial bias of the kind alleged in this case differs in critical ways from the compromise verdict in *McDonald*, the drug and alcohol abuse in *Tanner*, or the pro-defendant bias in *Warger*. The behavior in those cases is troubling and unacceptable, but each involved anomalous behavior from a single jury—or juror—gone off course. Jurors are presumed to follow their oath, cf. *Penry* v. *Johnson*, 532 U. S. 782, 799 (2001), and neither history nor common experience show that the jury system is rife with mischief of these or similar kinds. To attempt to rid the jury of every irregularity of this sort would be to expose it to unrelenting scrutiny. "It is not at all clear . . . that the jury system could survive such efforts to perfect it." *Tanner*, 483 U. S., at 120.

The same cannot be said about racial bias, a familiar and recurring evil that, if left unaddressed, would risk

systemic injury to the administration of justice. This Court's decisions demonstrate that racial bias implicates unique historical, constitutional, and institutional concerns. An effort to address the most grave and serious statements of racial bias is not an effort to perfect the jury but to ensure that our legal system remains capable of coming ever closer to the promise of equal treatment under the law that is so central to a functioning democracy.

Racial bias is distinct in a pragmatic sense as well. In past cases this Court has relied on other safeguards to protect the right to an impartial jury. Some of those safeguards, to be sure, can disclose racial bias. *Voir dire* at the outset of trial, observation of juror demeanor and conduct during trial, juror reports before the verdict, and nonjuror evidence after trial are important mechanisms for discovering bias. Yet their operation may be compromised, or they may prove insufficient. For instance, this Court has noted the dilemma faced by trial court judges and counsel in deciding whether to explore potential racial bias at *voir dire*. See *Rosales-Lopez*, *supra*; *Ristaino* v. *Ross*, 424 U. S. 589 (1976). Generic questions about juror impartiality may not expose specific attitudes or biases that can poison jury deliberations. Yet more pointed questions "could well exacerbate whatever prejudice might exist without substantially aiding in exposing it." *Rosales-Lopez*, *supra*, at 195 (Rehnquist, J., concurring in result).

The stigma that attends racial bias may make it difficult for a juror to report inappropriate statements during the course of juror deliberations. It is one thing to accuse a fellow juror of having a personal experience that improperly influences her consideration of the case, as would have been required in *Warger*. It is quite another to call her a bigot.

The recognition that certain of the *Tanner* safeguards may be less effective in rooting out racial bias than other

kinds of bias is not dispositive. All forms of improper bias pose challenges to the trial process. But there is a sound basis to treat racial bias with added precaution. A constitutional rule that racial bias in the justice system must be addressed—including, in some instances, after the verdict has been entered—is necessary to prevent a systemic loss of confidence in jury verdicts, a confidence that is a central premise of the Sixth Amendment trial right.

B

For the reasons explained above, the Court now holds that where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee.

Not every offhand comment indicating racial bias or hostility will justify setting aside the no-impeachment bar to allow further judicial inquiry. For the inquiry to proceed, there must be a showing that one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict. To qualify, the statement must tend to show that racial animus was a significant motivating factor in the juror's vote to convict. Whether that threshold showing has been satisfied is a matter committed to the substantial discretion of the trial court in light of all the circumstances, including the content and timing of the alleged statements and the reliability of the proffered evidence.

The practical mechanics of acquiring and presenting such evidence will no doubt be shaped and guided by state rules of professional ethics and local court rules, both of which often limit counsel's post-trial contact with jurors. See 27 C. Wright & V. Gold, Federal Practice and Proce-

dure: Evidence §6076, pp. 580–583 (2d ed. 2007) (Wright); see also Variations of ABA Model Rules of Professional Conduct, Rule 3.5 (Sept. 15, 2016) (overview of state ethics rules); 2 Jurywork Systematic Techniques §13:18 (2016–2017) (overview of Federal District Court rules). These limits seek to provide jurors some protection when they return to their daily affairs after the verdict has been entered. But while a juror can always tell counsel they do not wish to discuss the case, jurors in some instances may come forward of their own accord.

That is what happened here. In this case the alleged statements by a juror were egregious and unmistakable in their reliance on racial bias. Not only did juror H. C. deploy a dangerous racial stereotype to conclude petitioner was guilty and his alibi witness should not be believed, but he also encouraged other jurors to join him in convicting on that basis.

Petitioner's counsel did not seek out the two jurors' allegations of racial bias. Pursuant to Colorado's mandatory jury instruction, the trial court had set limits on juror contact and encouraged jurors to inform the court if anyone harassed them about their role in the case. Similar limits on juror contact can be found in other jurisdictions that recognize a racial-bias exception. See, *e.g.,* Fla. Standard Jury Instrs. in Crim. Cases No. 4.2 (West 2016) ("Although you are at liberty to speak with anyone about your deliberations, you are also at liberty to refuse to speak to anyone"); Mass. Office of Jury Comm'r, Trial Juror's Handbook (Dec. 2015) ("You are not required to speak with anyone once the trial is over. . . . If anyone tries to learn this confidential information from you, or if you feel harassed or embarrassed in any way, you should report it to the court . . . immediately"); N. J. Crim. Model Jury Charges, Non 2C Charges, Dismissal of Jury (2014) ("It will be up to each of you to decide whether to speak about your service as a juror").

With the understanding that they were under no obligation to speak out, the jurors approached petitioner's counsel, within a short time after the verdict, to relay their concerns about H. C.'s statements. App. 77. A similar pattern is common in cases involving juror allegations of racial bias. See, *e.g., Villar*, 586 F. 3d, at 78 (juror e-mailed defense counsel within hours of the verdict); *Kittle* v. *United States*, 65 A. 3d 1144, 1147 (D. C. 2013) (juror wrote a letter to the judge the same day the court discharged the jury); *Benally*, 546 F. 3d, at 1231 (juror approached defense counsel the day after the jury announced its verdict). Pursuant to local court rules, petitioner's counsel then sought and received permission from the court to contact the two jurors and obtain affidavits limited to recounting the exact statements made by H. C. that exhibited racial bias.

While the trial court concluded that Colorado's Rule 606(b) did not permit it even to consider the resulting affidavits, the Court's holding today removes that bar. When jurors disclose an instance of racial bias as serious as the one involved in this case, the law must not wholly disregard its occurrence.

C

As the preceding discussion makes clear, the Court relies on the experiences of the 17 jurisdictions that have recognized a racial-bias exception to the no-impeachment rule—some for over half a century—with no signs of an increase in juror harassment or a loss of juror willingness to engage in searching and candid deliberations.

The experience of these jurisdictions, and the experience of the courts going forward, will inform the proper exercise of trial judge discretion in these and related matters. This case does not ask, and the Court need not address, what procedures a trial court must follow when confronted with a motion for a new trial based on juror testimony of racial

bias. See 27 Wright 575–578 (noting a divergence of authority over the necessity and scope of an evidentiary hearing on alleged juror misconduct). The Court also does not decide the appropriate standard for determining when evidence of racial bias is sufficient to require that the verdict be set aside and a new trial be granted. Compare, *e.g., Shillcutt*, 827 F. 2d, at 1159 (inquiring whether racial bias "pervaded the jury room"), with, *e.g., Henley*, 238 F. 3d, at 1120 ("One racist juror would be enough").

D

It is proper to observe as well that there are standard and existing processes designed to prevent racial bias in jury deliberations. The advantages of careful *voir dire* have already been noted. And other safeguards deserve mention.

Trial courts, often at the outset of the case and again in their final jury instructions, explain the jurors' duty to review the evidence and reach a verdict in a fair and impartial way, free from bias of any kind. Some instructions are framed by trial judges based on their own learning and experience. Model jury instructions likely take into account these continuing developments and are common across jurisdictions. See, *e.g.,* 1A K. O'Malley, J. Grenig, & W. Lee, Federal Jury Practice and Instructions, Criminal §10:01, p. 22 (6th ed. 2008) ("Perform these duties fairly. Do not let any bias, sympathy or prejudice that you may feel toward one side or the other influence your decision in any way"). Instructions may emphasize the group dynamic of deliberations by urging jurors to share their questions and conclusions with their colleagues. See, *e.g., id*., §20:01, at 841 ("It is your duty as jurors to consult with one another and to deliberate with one another with a view towards reaching an agreement if you can do so without violence to individual judgment").

Probing and thoughtful deliberation improves the likeli-

hood that other jurors can confront the flawed nature of reasoning that is prompted or influenced by improper biases, whether racial or otherwise. These dynamics can help ensure that the exception is limited to rare cases.

\*  \*  \*

The Nation must continue to make strides to overcome race-based discrimination. The progress that has already been made underlies the Court's insistence that blatant racial prejudice is antithetical to the functioning of the jury system and must be confronted in egregious cases like this one despite the general bar of the no-impeachment rule. It is the mark of a maturing legal system that it seeks to understand and to implement the lessons of history. The Court now seeks to strengthen the broader principle that society can and must move forward by achieving the thoughtful, rational dialogue at the foundation of both the jury system and the free society that sustains our Constitution.

The judgment of the Supreme Court of Colorado is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

APPENDIX

*Codified Exceptions in Addition to Those Enumerated in
Fed. Rule Evid. 606(b)*

See Ariz. Rules Crim. Proc. 24.1(c)(3), (d) (2011) (exception for evidence of misconduct, including verdict by game of chance or intoxication); Idaho Rule Evid. 606(b) (2016) (game of chance); Ind. Rule Evid. 606(b)(2)(A) (Burns 2014) (drug or alcohol use); Minn. Rule Evid. 606(b) (2014) (threats of violence or violent acts); Mont. Rule Evid. 606(b) (2015) (game of chance); N. D. Rule Evid. 606(b)(2)(C) (2016–2017) (same); Tenn. Rule Evid. 606(b) (2016) (quotient verdict or game of chance); Tex. Rule Evid. 606(b)(2)(B) (West 2016) (rebutting claim juror was unqualified); Vt. Rule Evid. 606(b) (Cum. Supp. 2016) (juror communication with nonjuror); see also 27 C. Wright & V. Gold, Federal Practice and Procedure: Evidence §6071, p. 447, and n. 66 (2d ed. 2007); *id.,* at 451, and n. 70; *id.,* at 452, and n. 72.

*Judicially Recognized Exceptions for Evidence of Racial
Bias*

See *State* v. *Santiago*, 245 Conn. 301, 323–340, 715 A. 2d 1, 14–22 (1998); *Kittle* v. *United States*, 65 A. 3d 1144, 1154–1556 (D. C. 2013); *Fisher* v. *State*, 690 A. 2d 917, 919–921, and n. 4 (Del. 1996) (Appendix to opinion), *Powell* v. *Allstate Ins. Co.*, 652 So. 2d 354, 357–358 (Fla. 1995); *Spencer* v. *State*, 260 Ga. 640, 643–644, 398 S. E. 2d 179, 184–185 (1990); *State* v. *Jackson*, 81 Haw. 39, 48–49, 912 P. 2d 71, 80–81 (1996); *Commonwealth* v. *Laguer*, 410 Mass. 89, 97–98, 571 N. E. 2d 371, 376 (1991); *State* v. *Callender*, 297 N. W. 2d 744, 746 (Minn. 1980); *Fleshner* v. *Pepose Vision Inst., P. C.*, 304 S. W. 3d 81, 87–90 (Mo.

Appendix to opinion of the Court

2010); *State* v. *Levitt*, 36 N. J. 266, 271–273, 176 A. 2d 465, 467–468 (1961); *People* v. *Rukaj*, 123 App. Div. 2d 277, 280–281, 506 N. Y. S. 2d 677, 679–680 (1986); *State* v. *Hidanovic*, 2008 ND 66, ¶¶21–26, 747 N. W. 2d 463, 472–474; *State* v. *Brown*, 62 A. 3d 1099, 1110 (R. I. 2013); *State* v. *Hunter*, 320 S. C. 85, 88, 463 S. E. 2d 314, 316 (1995); *Seattle* v. *Jackson*, 70 Wash. 2d 733, 738, 425 P. 2d 385, 389 (1967); *After Hour Welding, Inc.* v. *Laneil Management Co.*, 108 Wis. 2d 734, 739–740, 324 N. W. 2d 686, 690 (1982).

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–606

_____

## MIGUEL ANGEL PENA-RODRIGUEZ, PETITIONER *v.* COLORADO

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF COLORADO

[March 6, 2017]

JUSTICE THOMAS, dissenting.

The Court today holds that the Sixth Amendment requires the States to provide a criminal defendant the opportunity to impeach a jury's guilty verdict with juror testimony about a juror's alleged racial bias, notwithstanding a state procedural rule forbidding such testimony. I agree with JUSTICE ALITO that the Court's decision is incompatible with the text of the Amendment it purports to interpret and with our precedents. I write separately to explain that the Court's holding also cannot be squared with the original understanding of the Sixth or Fourteenth Amendments.

I

The Sixth Amendment's protection of the right, "[i]n all criminal prosecutions," to a "trial, by an impartial jury," is limited to the protections that existed at common law when the Amendment was ratified. See, *e.g., Apprendi* v. *New Jersey*, 530 U. S. 466, 500, and n. 1 (2000) (THOMAS, J., concurring); 3 J. Story, Commentaries on the Constitution of the United States §1773, pp. 652–653 (1833) (Story) (explaining that "the trial by jury in criminal cases" protected by the Constitution is the same "great privilege" that was "a part of that admirable common law" of England); cf. 5 St. G. Tucker, Blackstone's Commentaries 349,

n. 2 (1803).  It is therefore "entirely proper to look to the common law" to ascertain whether the Sixth Amendment requires the result the Court today reaches.  *Apprendi*, *supra,* at 500, n. 1.

The Sixth Amendment's specific guarantee of impartiality incorporates the common-law understanding of that term.  See, *e.g.,* 3 W. Blackstone, Commentaries on the Laws of England 365 (1769) (Blackstone) (describing English trials as "impartially just" because of their "caution against all partiality and bias" in the jury).  The common law required a juror to have "freedome of mind" and to be "indifferent as hee stands unsworne."  1 E. Coke, First Part of the Institutes of the Laws of England §234, p. 155a (16th ed. 1809); accord, 3 M. Bacon, A New Abridgment of the Law 258 (3d ed. 1768); cf. T. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 319 (1868) ("The jury must be indifferent between the prisoner and the commonwealth").  Impartial jurors could "have no interest of their own affected, and no personal bias, or pre-possession, in favor [of] or against either party."  *Pettis* v. *Warren*, 1 Kirby 426, 427 (Conn. Super. 1788).

## II

The common-law right to a jury trial did not, however, guarantee a defendant the right to impeach a jury verdict with juror testimony about juror misconduct, including "a principal species of [juror] misbehaviour"—"notorious partiality."  3 Blackstone 388.  Although partiality was a ground for setting aside a jury verdict, *ibid.,* the English common-law rule at the time the Sixth Amendment was ratified did not allow jurors to supply evidence of that misconduct.  In 1770, Lord Mansfield refused to receive a juror's affidavit to impeach a verdict, declaring that such an affidavit "can't be read."  *Rex* v. *Almon*, 5 Burr. 2687,

98 Eng. Rep. 411 (K. B.). And in 1785, Lord Mansfield solidified the doctrine, holding that "[t]he Court [could not] receive such an affidavit from any of the jurymen" to prove that the jury had cast lots to reach a verdict. *Vaise* v. *Delaval*, 1 T. R. 11, 99 Eng. Rep. 944 (K. B.).[1]

At the time of the founding, the States took mixed approaches to this issue. See *Cluggage* v. *Swan*, 4 Binn. 150, 156 (Pa. 1811) (opinion of Yeates, J.) ("The opinions of *American* judges . . . have greatly differed on the point in question"); *Bishop* v. *Georgia*, 9 Ga. 121, 126 (1850) (describing the common law in 1776 on this question as "in a *transition* state"). Many States followed Lord Mansfield's no-impeachment rule and refused to receive juror affidavits. See, *e.g., Brewster* v. *Thompson*, 1 N. J. L. 32 (1790) (*per curiam*); *Robbins* v. *Windover*, 2 Tyl. 11, 14 (Vt. 1802); *Taylor* v. *Giger*, 3 Ky. 586, 597–598 (1808); *Price* v. *McIlvain*, 2 Tread. 503, 504 (S. C. 1815); *Tyler* v. *Stevens*, 4 N. H. 116, 117 (1827); 1 Z. Swift, A Digest of the Laws of the State of Connecticut 775 (1822) ("In England, and in the courts of the United States, jurors are not permitted to be witnesses respecting the misconduct of the jury . . . and this is, most unquestionably, the correct principle"). Some States, however, permitted juror affidavits about juror misconduct. See, *e.g., Crawford* v. *State*, 10 Tenn. 60, 68 (1821); *Cochran* v. *Street*, 1 Va. 79, 81 (1792). And others initially permitted such evidence but quickly reversed course. Compare, *e.g., Smith* v. *Cheetham*, 3 Cai. R. 57,

---

[1] Prior to 1770, it appears that juror affidavits were sometimes received to impeach a verdict on the ground of juror misbehavior, although only "with great caution." *McDonald* v. *Pless*, 238 U. S. 264, 268 (1915); see, *e.g., Dent* v. *The Hundred of Hertford*, 2 Salk. 645, 91 Eng. Rep. 546 (K. B. 1696); *Philips* v. *Fowler*, Barnes. 441, 94 Eng. Rep. 994 (K. B. 1735). But "previous to our Revolution, and at least as early as 1770, the doctrine in England was distinctly ruled the other way, and has so stood ever since." 3 T. Waterman, A Treatise on the Principles of Law and Equity Which Govern Courts in the Granting of New Trials in Cases Civil and Criminal 1429 (1855).

59–60 (N. Y. 1805) (opinion of Livingston, J.) (permitting juror testimony), with *Dana* v. *Tucker*, 4 Johns. 487, 488–489 (N. Y. 1809) (*per curiam*) (overturning *Cheetham*); compare also *Bradley's Lessee* v. *Bradley*, 4 Dall. 112 (Pa. 1792) (permitting juror affidavits), with, *e.g., Cluggage*, *supra,* at 156–158 (opinion of Yeates, J.) (explaining that *Bradley* was incorrectly reported and rejecting affidavits); compare also *Talmadge* v. *Northrop*, 1 Root 522 (Conn. 1793) (admitting juror testimony), with *State* v. *Freeman*, 5 Conn. 348, 350–352 (1824) ("The opinion of almost the whole legal world is adverse to the reception of the testimony in question; and, in my opinion, on invincible foundations").

By the time the Fourteenth Amendment was ratified, Lord Mansfield's no-impeachment rule had become firmly entrenched in American law. See Lettow, New Trial for Verdict Against Law: Judge-Jury Relations in Early-Nineteenth Century America, 71 Notre Dame L. Rev. 505, 536 (1996) ("[O]pponents of juror affidavits had largely won out by the middle of the century"); 8 J. Wigmore, Evidence in Trials at Common Law §2352, p. 697 (J. McNaughton rev. 1961) (Wigmore) (Lord Mansfield's rule "came to receive in the United States an adherence almost unquestioned"); J. Proffatt, A Treatise on Trial by Jury §408, p. 467 (1877) ("It is a well established rule of law that no affidavit shall be received from a juror to impeach his verdict"). The vast majority of States adopted the no-impeachment rule as a matter of common law. See, *e.g., Bull* v. *Commonwealth*, 55 Va. 613, 627–628 (1857) ("[T]he practice appears to be now generally settled, to reject the testimony of jurors when offered to impeach their verdict. The cases on the subject are too numerous to be cited"); *Tucker* v. *Town Council of South Kingstown*, 5 R. I. 558, 560 (1859) (collecting cases); *State* v. *Coupenhaver*, 39 Mo. 430 (1867) ("The law is well settled that a traverse juror cannot be a witness to prove misbehavior in the jury in

regard to their verdict"); *Peck* v. *Brewer*, 48 Ill. 54, 63 (1868) ("So far back as . . . 1823, the doctrine was held that the affidavits of jurors cannot be heard to impeach their verdict"); *Heffron* v. *Gallupe*, 55 Me. 563, 566 (1868) (ruling inadmissible "depositions of . . . jurors as to what transpired in the jury room"); *Withers* v. *Fiscus*, 40 Ind. 131, 131–132 (1872) ("In the United States it seems to be settled, notwithstanding a few adjudications to the contrary . . . , that such affidavits cannot be received").[2]

The Court today acknowledges that the States "adopted the Mansfield rule as a matter of common law," *ante,* at 6, but ascribes no significance to that fact. I would hold that it is dispositive. Our common-law history does not establish that—in either 1791 (when the Sixth Amendment was ratified) or 1868 (when the Fourteenth Amendment was ratified)—a defendant had the right to impeach a verdict with juror testimony of juror misconduct. In fact, it strongly suggests that such evidence was prohibited. In the absence of a definitive common-law tradition permitting impeachment by juror testimony, we have no basis to invoke a constitutional provision that merely "follow[s] out the established course of the common law in all trials for crimes," 3 Story §1785, at 662, to overturn Colorado's decision to preserve the no-impeachment rule, cf. *Boumediene* v. *Bush*, 553 U. S. 723, 832–833 (2008) (Scalia, J., dissenting).

\*    \*    \*

Perhaps good reasons exist to curtail or abandon the no-impeachment rule. Some States have done so, see Appendix to majority opinion, *ante*, and others have not. Ulti-

———————

[2] Although two States declined to follow the rule in the mid-19th century, see *Wright* v. *Illinois & Miss. Tel. Co.*, 20 Iowa 195, 210 (1866); *Perry* v. *Bailey*, 12 Kan. 539, 544–545 (1874), "most of the state courts" had already "committed themselves upon the subject," 8 Wigmore §2354, at 702.

mately, that question is not for us to decide. It should be left to the political process described by JUSTICE ALITO. See *post,* at 5–7 (dissenting opinion). In its attempt to stimulate a "thoughtful, rational dialogue" on race relations, *ante,* at 21, the Court today ends the political process and imposes a uniform, national rule. The Constitution does not require such a rule. Neither should we.

I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–606

_____

## MIGUEL ANGEL PENA-RODRIGUEZ, PETITIONER *v.* COLORADO

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF COLORADO

[March 6, 2017]

JUSTICE ALITO, with whom THE CHIEF JUSTICE and JUSTICE THOMAS join, dissenting.

Our legal system has many rules that restrict the admission of evidence of statements made under circumstances in which confidentiality is thought to be essential. Statements made to an attorney in obtaining legal advice, statements to a treating physician, and statements made to a spouse or member of the clergy are familiar examples. See *Trammel* v. *United States*, 445 U. S. 40, 51 (1980). Even if a criminal defendant whose constitutional rights are at stake has a critical need to obtain and introduce evidence of such statements, long-established rules stand in the way. The goal of avoiding interference with confidential communications of great value has long been thought to justify the loss of important evidence and the effect on our justice system that this loss entails.

The present case concerns a rule like those just mentioned, namely, the age-old rule against attempting to overturn or "impeach" a jury's verdict by offering statements made by jurors during the course of deliberations. For centuries, it has been the judgment of experienced judges, trial attorneys, scholars, and lawmakers that allowing jurors to testify after a trial about what took place in the jury room would undermine the system of trial by jury that is integral to our legal system.

Juries occupy a unique place in our justice system. The other participants in a trial—the presiding judge, the attorneys, the witnesses—function in an arena governed by strict rules of law. Their every word is recorded and may be closely scrutinized for missteps.

When jurors retire to deliberate, however, they enter a space that is not regulated in the same way. Jurors are ordinary people. They are expected to speak, debate, argue, and make decisions the way ordinary people do in their daily lives. Our Constitution places great value on this way of thinking, speaking, and deciding. The jury trial right protects parties in court cases from being judged by a special class of trained professionals who do not speak the language of ordinary people and may not understand or appreciate the way ordinary people live their lives. To protect that right, the door to the jury room has been locked, and the confidentiality of jury deliberations has been closely guarded.

Today, with the admirable intention of providing justice for one criminal defendant, the Court not only pries open the door; it rules that respecting the privacy of the jury room, as our legal system has done for centuries, violates the Constitution. This is a startling development, and although the Court tries to limit the degree of intrusion, it is doubtful that there are principled grounds for preventing the expansion of today's holding.

The Court justifies its decision on the ground that the nature of the confidential communication at issue in this particular case—a clear expression of what the Court terms racial bias[1]—is uniquely harmful to our criminal

---

[1] The bias at issue in this case was a "bias against Mexican men." App. 160. This might be described as bias based on national origin or ethnicity. Cf. *Hernandez* v. *New York*, 500 U. S. 352, 355 (1991) (plurality opinion); *Hernandez* v. *Texas*, 347 U. S. 475, 479 (1954). However, no party has suggested that these distinctions make a substantive

justice system. And the Court is surely correct that even a tincture of racial bias can inflict great damage on that system, which is dependent on the public's trust. But until today, the argument that the Court now finds convincing has not been thought to be sufficient to overcome confidentiality rules like the one at issue here.

Suppose that a prosecution witness gives devastating but false testimony against a defendant, and suppose that the witness's motivation is racial bias. Suppose that the witness admits this to his attorney, his spouse, and a member of the clergy. Suppose that the defendant, threatened with conviction for a serious crime and a lengthy term of imprisonment, seeks to compel the attorney, the spouse, or the member of the clergy to testify about the witness's admissions. Even though the constitutional rights of the defendant hang in the balance, the defendant's efforts to obtain the testimony would fail. The Court provides no good reason why the result in this case should not be the same.

I

Rules barring the admission of juror testimony to impeach a verdict (so-called "no-impeachment rules") have a long history. Indeed, they pre-date the ratification of the Constitution. They are typically traced back to *Vaise* v. *Delaval*, 1 T. R. 11, 99 Eng. Rep. 944 (K. B. 1785), in which Lord Mansfield declined to consider an affidavit from two jurors who claimed that the jury had reached its verdict by lot. See *Warger* v. *Shauers*, 574 U. S. \_\_\_, \_\_\_ (2014) (slip op., at 4). Lord Mansfield's approach "soon took root in the United States," *ibid.,* and "[b]y the beginning of [the 20th] century, if not earlier, the near-universal and firmly established common-law rule in the

difference in this case.

United States flatly prohibited the admission of juror testimony to impeach a jury verdict," *Tanner* v. *United States*, 483 U. S. 107, 117 (1987); see 27 C. Wright & V. Gold, Federal Practice and Procedure: Evidence §6071, p. 431 (2d ed. 2007) (Wright & Gold) (noting that the Mansfield approach "came to be accepted in almost all states").

In *McDonald* v. *Pless*, 238 U. S. 264 (1915), this Court adopted a strict no-impeachment rule for cases in federal court. *McDonald* involved allegations that the jury had entered a quotient verdict—that is, that it had calculated a damages award by taking the average of the jurors' suggestions. *Id.*, at 265–266. The Court held that evidence of this misconduct could not be used. *Id.,* at 269. It applied what it said was "unquestionably the general rule, that the losing party cannot, in order to secure a new trial, use the testimony of jurors to impeach their verdict." *Ibid.* The Court recognized that the defendant had a powerful interest in demonstrating that the jury had "adopted an arbitrary and unjust method in arriving at their verdict." *Id.*, at 267. "But," the Court warned, "let it once be established that verdicts . . . can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding." *Ibid.* This would lead to "harass[ment]" of jurors and "the destruction of all frankness and freedom of discussion and conference." *Id.*, at 267–268. Ultimately, even though the no-impeachment rule "may often exclude the only possible evidence of misconduct," relaxing the rule "would open the door to the most pernicious arts and tampering with jurors." *Id.*, at 268 (internal quotation marks omitted).

The firm no-impeachment approach taken in *McDonald* came to be known as "the federal rule." This approach categorically bars testimony about jury deliberations, except where it is offered to demonstrate that the jury was

subjected to an extraneous influence (for example, an attempt to bribe a juror). *Warger*, *supra*, at ___ (slip op., at 5); *Tanner*, *supra*, at 117;[2] see 27 Wright & Gold §6071, at 432–433.

Some jurisdictions, notably Iowa, adopted a more permissive rule. Under the Iowa rule, jurors were generally permitted to testify about any subject except their "subjective intentions and thought processes in reaching a verdict." *Warger*, *supra*, at ___ (slip op., at 4). Accordingly, the Iowa rule allowed jurors to "testify as to events or conditions which might have improperly influenced the verdict, even if these took place during deliberations within the jury room." 27 Wright & Gold §6071, at 432.

Debate between proponents of the federal rule and the Iowa rule emerged during the framing and adoption of Federal Rule of Evidence 606(b). Both sides had their supporters. The contending arguments were heard and considered, and in the end the strict federal approach was retained.

An early draft of the Advisory Committee on the Federal Rules of Evidence included a version of the Iowa rule, 51 F. R. D. 315, 387–388 (1971). That draft was forcefully criticized, however,[3] and the Committee ultimately pro-

_____

[2] As this Court has explained, the extraneous influence exception "do[es] not detract from, but rather harmonize[s] with, the weighty government interest in insulating the jury's deliberative process." *Tanner*, 483 U. S., at 120. The extraneous influence exception, like the no-impeachment rule itself, is directed at protecting jury deliberations against unwarranted interference. *Ibid.*

[3] In particular, the Justice Department observed that "[s]trong policy considerations continue to support" the federal approach and that "[r]ecent experience has shown that the danger of harassment of jurors by unsuccessful litigants warrants a rule which imposes strict limitations on the instances in which jurors may be questioned about their verdict." Letter from R. Kliendienst, Deputy Attorney General, to Judge A. Maris (Aug. 9, 1971), 117 Cong. Rec. 33648, 33655 (1971).

duced a revised draft that retained the well-established
federal approach. *Tanner*, *supra*, at 122; see Committee
on Rules of Practice and Procedure of the Judicial Confer-
ence of the United States, Revised Draft of Proposed Rules
of Evidence for the United States Courts and Magistrates
73 (Oct. 1971). Expressly repudiating the Iowa rule, the
new draft provided that jurors generally could not testify
"as to any matter or statement occurring during the course
of the jury's deliberations." *Ibid.* This new version was
approved by the Judicial Conference and sent to this
Court, which adopted the rule and referred it to Congress.
56 F. R. D. 183, 265–266 (1972).

   Initially, the House rejected this Court's version of Rule
606(b) and instead reverted to the earlier (and narrower)
Advisory Committee draft. *Tanner*, *supra*, at 123; see
H. R. Rep. No. 93–650, pp. 9–10 (1973) (criticizing the
Supreme Court draft for preventing jurors from testifying
about "quotient verdict[s]" and other "irregularities which
occurred in the jury room"). In the Senate, however, the
Judiciary Committee favored this Court's rule. The Com-
mittee Report observed that the House draft broke with
"long-accepted Federal law" by allowing verdicts to be
"challenge[d] on the basis of what happened during the
jury's internal deliberations." S. Rep. No. 93–1277, p. 13
(1974) (S. Rep.). In the view of the Senate Committee, the
House rule would have "permit[ted] the harassment of
former jurors" as well as "the possible exploitation of
disgruntled or otherwise badly-motivated ex-jurors." *Id.*,

———————

And Senator McClellan, an influential member of the Senate Judiciary
Committee, insisted that the "mischief in this Rule ought to be plain for
all to see" and that it would be impossible "to conduct trials, particu-
larly criminal prosecutions, as we know them today, if every verdict were
followed by a post-trial hearing into the conduct of the juror's delibera-
tions." Letter from Sen. J. McClellan to Judge A. Maris (Aug. 12,
1971), *id.,* at 33642, 33645.

at 14. This result would have undermined the finality of verdicts, violated "common fairness," and prevented jurors from "function[ing] effectively." *Ibid.* The Senate rejected the House version of the rule and returned to the Court's rule. A Conference Committee adopted the Senate version, see H. R. Conf. Rep. No. 93–1597, p. 8 (1974), and this version was passed by both Houses and was signed into law by the President.

As this summary shows, the process that culminated in the adoption of Federal Rule of Evidence 606(b) was the epitome of reasoned democratic rulemaking. The "distinguished, Supreme Court-appointed" members of the Advisory Committee went through a 7-year drafting process, "produced two well-circulated drafts," and "considered numerous comments from persons involved in nearly every area of court-related law." Rothstein, The Proposed Amendments to the Federal Rules of Evidence, 62 Geo. L. J. 125 (1973). The work of the Committee was considered and approved by the experienced appellate and trial judges serving on the Judicial Conference and by our predecessors on this Court. After that, the matter went to Congress, which "specifically understood, considered, and rejected a version of [the rule] that would have allowed jurors to testify on juror conduct during deliberations." *Tanner*, 483 U. S., at 125. The judgment of all these participants in the process, which was informed by their assessment of an empirical issue, *i.e.*, the effect that the competing Iowa rule would have had on the jury system, is entitled to great respect.

Colorado considered this same question, made the same judgment as the participants in the federal process, and adopted a very similar rule. In doing so, it joined the overwhelming majority of States. *Ante,* at 9. In the great majority of jurisdictions, strong no-impeachment rules continue to be "viewed as both promoting the finality of verdicts and insulating the jury from outside influences."

*Warger*, 574 U. S., at \_\_\_ (slip op., at 4).

II

A

Recognizing the importance of Rule 606(b), this Court has twice rebuffed efforts to create a Sixth Amendment exception—first in *Tanner* and then, just two Terms ago, in *Warger*.

The *Tanner* petitioners were convicted of committing mail fraud and conspiring to defraud the United States. 483 U. S., at 109–110, 112–113. After the trial, two jurors came forward with disturbing stories of juror misconduct. One claimed that several jurors "consumed alcohol during lunch breaks . . . causing them to sleep through the after-noons." *Id.*, at 113. The second added that jurors also smoked marijuana and ingested cocaine during the trial. *Id.*, at 115–116. This Court held that evidence of this bacchanalia could properly be excluded under Rule 606(b). *Id.*, at 127.

The Court noted that "[s]ubstantial policy considera-tions support the common-law rule against the admission of jury testimony to impeach a verdict." *Id.,* at 119. While there is "little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior," the Court observed, it is "not at all clear . . . that the jury system could survive such efforts to perfect it." *Id.*, at 120. Allowing such post-verdict inquiries would "seriously disrupt the finality of the pro-cess." *Ibid.* It would also undermine "full and frank dis-cussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople." *Id.*, at 120–121.

The *Tanner* petitioners, of course, had a Sixth Amend-ment right "to 'a tribunal both impartial and mentally competent to afford a hearing.'" *Id.*, at 126 (quoting *Jor-*

*dan* v. *Massachusetts*, 225 U. S. 167, 176 (1912)). The question, however, was whether they also had a right to an evidentiary hearing featuring "one particular kind of evidence inadmissible under the Federal Rules." 483 U. S., at 126–127. Turning to that question, the Court noted again that "long-recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry." *Id.*, at 127. By contrast, "[p]etitioners' Sixth Amendment interests in an unimpaired jury . . . [were] protected by several aspects of the trial process." *Ibid.*

The Court identified four mechanisms that protect defendants' Sixth Amendment rights. First, jurors can be "examined during *voir dire.*" *Ibid.* Second, "during the trial the jury is observable by the court, by counsel, and by court personnel." *Ibid.* Third, "jurors are observable by each other, and may report inappropriate juror behavior to the court *before* they render a verdict." *Ibid.* And fourth, "after the trial a party may seek to impeach the verdict by nonjuror evidence of misconduct." *Ibid.* These "other sources of protection of petitioners' right to a competent jury" convinced the Court that the juror testimony was properly excluded. *Ibid.*

*Warger* involved a negligence suit arising from a motor-cycle crash. 574 U. S., at ___ (slip op., at 1). During *voir dire*, the individual who eventually became the jury's foreperson said that she could decide the case fairly and impartially. *Id.,* at ___ (slip op., at 2). After the jury returned a verdict in favor of the defendant, one of the jurors came forward with evidence that called into question the truthfulness of the foreperson's responses during *voir dire.* According to this juror, the foreperson revealed during the deliberations that her daughter had once caused a deadly car crash, and the foreperson expressed the belief that a lawsuit would have ruined her daughter's life. *Ibid.*

In seeking to use this testimony to overturn the jury's verdict, the plaintiff's primary contention was that Rule 606(b) does not apply to evidence concerning a juror's alleged misrepresentations during *voir dire.* If otherwise interpreted, the plaintiff maintained, the rule would threaten his right to trial by an impartial jury.[4] The Court disagreed, in part because "any claim that Rule 606(b) is unconstitutional in circumstances such as these is foreclosed by our decision in *Tanner*." *Id.,* at ___ (slip op., at 10). The Court explained that "[e]ven if jurors lie in *voir dire* in a way that conceals bias, juror impartiality is adequately assured by" two of the other *Tanner* safeguards: pre-verdict reports by the jurors and non-juror evidence. 574 U. S., at ___ (slip op., at 10).

*Tanner* and *Warger* fit neatly into this Court's broader jurisprudence concerning the constitutionality of evidence rules. As the Court has explained, "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes* v. *South Carolina*, 547 U. S. 319, 324 (2006) (internal quotation marks and alteration omitted). Thus, evidence rules of this sort have been invalidated only if they "serve no legitimate purpose or . . . are disproportionate to the ends that they are asserted to promote." *Id.,* at 326. *Tanner* and *Warger* recognized that Rule 606(b) serves vital purposes and does not impose a disproportionate burden on the jury trial right.

Today, for the first time, the Court creates a constitutional exception to no-impeachment rules. Specifically, the Court holds that no-impeachment rules violate the Sixth Amendment to the extent that they preclude courts

_____

[4] Although *Warger* was a civil case, we wrote that "[t]he Constitution guarantees both criminal and civil litigants a right to an impartial jury." 574 U. S., at ___ (slip op., at 9).

from considering evidence of a juror's racially biased comments. *Ante,* at 17. The Court attempts to distinguish *Tanner* and *Warger,* but its efforts fail.

*Tanner* and *Warger* rested on two basic propositions. First, no-impeachment rules advance crucial interests. Second, the right to trial by an impartial jury is adequately protected by mechanisms other than the use of juror testimony regarding jury deliberations. The first of these propositions applies regardless of the nature of the juror misconduct, and the Court does not argue otherwise. Instead, it contends that, in cases involving racially biased jurors, the *Tanner* safeguards are less effective and the defendant's Sixth Amendment interests are more profound. Neither argument is persuasive.

## B

As noted above, *Tanner* identified four "aspects of the trial process" that protect a defendant's Sixth Amendment rights: (1) *voir dire*; (2) observation by the court, counsel, and court personnel; (3) pre-verdict reports by the jurors; and (4) non-juror evidence. 483 U. S., at 127.[5] Although the Court insists that that these mechanisms "may be compromised" in cases involving allegations of racial bias, it addresses only two of them and fails to make a sustained argument about either. *Ante,* at 16.

### 1

First, the Court contends that the effectiveness of *voir dire* is questionable in cases involving racial bias because

---

[5] The majority opinion in this case identifies a fifth mechanism: jury instructions. It observes that, by explaining the jurors' responsibilities, appropriate jury instructions can promote "[p]robing and thoughtful deliberation," which in turn "improves the likelihood that other jurors can confront the flawed nature of reasoning that is prompted or influenced by improper biases." *Ante,* at 20–21. This mechanism, like those listed in *Tanner*, can help to prevent bias from infecting a verdict.

pointed questioning about racial attitudes may highlight racial issues and thereby exacerbate prejudice. *Ibid.* It is far from clear, however, that careful *voir dire* cannot surmount this problem. Lawyers may use questionnaires or individual questioning of prospective jurors[6] in order to elicit frank answers that a juror might be reluctant to voice in the presence of other prospective jurors.[7] More-over, practice guides are replete with advice on conducting effective *voir dire* on the subject of race. They outline a variety of subtle and nuanced approaches that avoid pointed questions.[8] And of course, if an attorney is con-

——————

[6] Both of those techniques were used in this case for other purposes. App. 13–14; Tr. 56–78 (Feb. 23, 2010, morning session).

[7] See *People* v. *Harlan*, 8 P. 3d 448, 500 (Colo. 2000) ("The trial court took precautions at the outset of the trial to foreclose the injection of improper racial considerations by including questions concerning racial issues in the jury questionnaire"); *Brewer* v. *Marshall,* 119 F. 3d 993, 996 (CA1 1997) ("The judge asked each juror, out of the presence of other jurors, whether they had any bias or prejudice for or against black persons or persons of Hispanic origin"); 6 W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure §22.3(a), p. 92 (4th ed. 2015) (noting that "[j]udges commonly allow jurors to approach the bench and discuss sensitive matters there" and are also free to conduct "in chambers discussions").

[8] See, *e.g.*, J. Gobert, E. Kreitzberg, & C. Rose, Jury Selection: The Law, Art, and Science of Selecting a Jury §7:41, pp. 357–358 (3d ed. 2014) (explaining that "the issue should be approached more indirectly" and suggesting the use of "[o]pen-ended questions" on subjects like "the composition of the neighborhood in which the juror lives, the juror's relationship with co-workers or neighbors of different races, or the juror's past experiences with persons of other races"); W. Jordan, Jury Selection §8.11, p. 237 (1980) (explaining that "the whole matter of prejudice" should be approached "delicately and cautiously" and giving an example of an indirect question that avoids the word "prejudice"); R. Wenke, The Art of Selecting a Jury 67 (1979) (discussing questions that could identify biased jurors when "your client is a member of a minority group"); *id.*, at 66 (suggesting that instead of "asking a juror if he is 'prejudiced'" the attorney should "inquire about his 'feeling,' 'belief' or 'opinion'"); 2 National Jury Project, Inc., Jurywork: Systematic Tech-

cerned that a juror is concealing bias, a peremptory strike may be used.[9]

The suggestion that *voir dire* is ineffective in unearthing bias runs counter to decisions of this Court holding that *voir dire* on the subject of race is constitutionally required in some cases, mandated as a matter of federal supervisory authority in others, and typically advisable in any case

————————

niques §17.23 (E. Krauss ed., 2d ed. 2010) (listing sample questions about racial prejudice); A. Grine & E. Coward, Raising Issues of Race in North Carolina Criminal Cases, p. 8–14 (2014) (suggesting that attorneys "share a brief example about a judgment shaped by a racial stereotype" to make it easier for jurors to share their own biased views), http://defendermanuals.sog.unc.edu/race/8-addressing-race-trial (as last visited Mar. 3, 2017); *id.*, at 8–15 to 8–17 (suggesting additional strategies and providing sample questions); T. Mauet, Trial Techniques 44 (8th ed. 2010) (suggesting that "likely beliefs and attitudes are more accurately learned through indirection"); J. Lieberman & B. Sales, Scientific Jury Selection 114–115 (2007) (discussing research suggesting that "participants were more likely to admit they were unable to abide by legal due process guarantees when asked open-ended questions that did not direct their responses").

[9]To the extent race does become salient during *voir dire*, there is social science research suggesting that this may actually combat rather than reinforce the jurors' biases. See, *e.g.*, Lee, A New Approach to *Voir Dire* on Racial Bias, 5 U. C. Irvine L. Rev. 843, 861 (2015) ("A wealth of fairly recent empirical research has shown that when race is made salient either through pretrial publicity, voir dire questioning of prospective jurors, opening and closing arguments, or witness testimony, White jurors are more likely to treat similarly situated Black and White defendants the same way"). See also Sommers & Ellsworth, White Juror Bias: An Investigation of Prejudice Against Black Defendants in the American Courtroom, 7 Psychology, Pub. Pol'y, & L. 201, 222 (2001); Sommers & Ellsworth, How Much Do We Really Know About Race and Juries? A Review of Social Science Theory and Research, 78 Chi.-Kent L. Rev. 997, 1013–1014, 1027 (2003); Schuller, Kazoleas, & Kawakami, The Impact of Prejudice Screening Procedures on Racial Bias in the Courtroom, 33 Law & Human Behavior 320, 326 (2009); Cohn, Bucolo, Pride, & Somers, Reducing White Juror Bias: The Role of Race Salience and Racial Attitudes, 39 J. Applied Soc. Psychology 1953, 1964–1965 (2009).

if a defendant requests it. See *Turner* v. *Murray*, 476 U. S. 28, 36–37 (1986); *Rosales-Lopez* v. *United States*, 451 U. S. 182, 192 (1981) (plurality opinion); *Ristaino* v. *Ross*, 424 U. S. 589, 597, n. 9 (1976). If *voir dire* were not useful in identifying racial prejudice, those decisions would be pointless. Cf. *Turner*, *supra*, at 36 (plurality opinion) (noting "the ease with which [the] risk [of racial bias] could have been minimized" through *voir dire*). Even the majority recognizes the "advantages of careful *voir dire*" as a "proces[s] designed to prevent racial bias in jury deliberations." *Ante,* at 20. And reported decisions substantiate that *voir dire* can be effective in this regard. *E.g.*, *Brewer* v. *Marshall,* 119 F. 3d 993, 995–996 (CA1 1997); *United States* v. *Hasting*, 739 F. 2d 1269, 1271 (CA7 1984); *People* v. *Harlan*, 8 P. 3d 448, 500 (Colo. 2000); see Brief for Respondent 23–24, n. 7 (listing additional cases). Thus, while *voir dire* is not a magic cure, there are good reasons to think that it is a valuable tool.

In any event, the critical point for present purposes is that the effectiveness of *voir dire* is a debatable empirical proposition. Its assessment should be addressed in the process of developing federal and state evidence rules. Federal and state rulemakers can try a variety of approaches, and they can make changes in response to the insights provided by experience and research. The approach taken by today's majority—imposing a federal constitutional rule on the entire country—prevents experimentation and makes change exceedingly hard.[10]

—————

[10] It is worth noting that, even if *voir dire* were entirely ineffective at detecting racial bias (a proposition no one defends), that still would not suffice to distinguish this case from *Warger* v. *Shauers*, 574 U. S. ___ (2014). After all, the allegation in *Warger* was that the foreperson had entirely circumvented *voir dire* by lying in order to shield her bias. The Court, nevertheless, concluded that even where "jurors lie in *voir dire* in a way that conceals bias, juror impartiality is adequately assured"

2

The majority also argues—even more cursorily—that "racial bias may make it difficult for a juror to report inappropriate statements during the course of juror deliberations." *Ante,* at 16. This is so, we are told, because it is difficult to "call [another juror] a bigot." *Ibid.*

Since the Court's decision mandates the admission of the testimony of one juror about a statement made by another juror during deliberations, what the Court must mean in making this argument is that jurors are less willing to report biased comments by fellow jurors prior to the beginning of deliberations (while they are still sitting with the biased juror) than they are after the verdict is announced and the jurors have gone home. But this is also a questionable empirical assessment, and the Court's seat-of-the-pants judgment is no better than that of those with the responsibility of drafting and adopting federal and state evidence rules. There is no question that jurors *do* report biased comments made by fellow jurors prior to the beginning of deliberations. See, *e.g., United States* v. *McClinton*, 135 F. 3d 1178, 1184–1185 (CA7 1998); *United States* v. *Heller*, 785 F. 2d 1524, 1525–1529 (CA11 1986); *Tavares* v. *Holbrook*, 779 F. 2d 1, 1–3 (CA1 1985) (Breyer, J.); see Brief for Respondent 31–32, n. 10; Brief for United States as *Amicus Curiae* 31. And the Court marshals no evidence that such pre-deliberation reporting is rarer than the post-verdict variety.

Even if there is something to the distinction that the Court makes between pre- and post-verdict reporting, it is debatable whether the difference is significant enough to merit different treatment. This is especially so because post-verdict reporting is both more disruptive and may be the result of extraneous influences. A juror who is ini-

———————

through other means. *Id.,* at \_\_\_ (slip op., at 10).

tially in the minority but is ultimately persuaded by other jurors may have second thoughts after the verdict is announced and may be angry with others on the panel who pressed for unanimity.  In addition, if a verdict is unpopular with a particular juror's family, friends, employer, co-workers, or neighbors, the juror may regret his or her vote and may feel pressured to rectify what the jury has done.

In short, the Court provides no good reason to depart from the calculus made in *Tanner* and *Warger.*  Indeed, the majority itself uses hedged language and appears to recognize that this "pragmatic" argument is something of a makeweight.  *Ante,* at 16–17 (noting that the argument is "not dispositive"); *ante,* at 16 (stating that the operation of the safeguards "may be compromised, or they may prove insufficient").

### III
### A

The real thrust of the majority opinion is that the Constitution is less tolerant of racial bias than other forms of juror misconduct, but it is hard to square this argument with the nature of the Sixth Amendment right on which petitioner's argument and the Court's holding are based. What the Sixth Amendment protects is the right to an "impartial jury."  Nothing in the text or history of the Amendment or in the inherent nature of the jury trial right suggests that the extent of the protection provided by the Amendment depends on the nature of a jury's partiality or bias.  As the Colorado Supreme Court aptly put it, it is hard to "discern a dividing line between different *types* of juror bias or misconduct, whereby one form of partiality would implicate a party's Sixth Amendment right while another would not."   350 P. 3d 287, 293

(2015).[11]

Nor has the Court found any decision of this Court suggesting that the Sixth Amendment recognizes some sort of hierarchy of partiality or bias. The Court points to a line of cases holding that, in some narrow circumstances, the Constitution requires trial courts to conduct *voir dire* on the subject of race. Those decisions, however, were not based on a ranking of types of partiality but on the Court's conclusion that in certain cases racial bias was especially likely. See *Turner,* 476 U. S., at 38, n. 12 (plurality opinion) (requiring *voir dire* on the subject of race where there is "a particularly compelling need to inquire into racial prejudice" because of a qualitatively higher "risk of racial bias"); *Ristaino*, 424 U. S., at 596 (explaining that the requirement applies only if there is a "constitutionally significant likelihood that, absent questioning about racial prejudice, the jurors would not be [impartial]").[12] Thus, this line of cases does not advance the majority's argument.

It is undoubtedly true that "racial bias implicates unique historical, constitutional, and institutional concerns." *Ante,* at 16. But it is hard to see what that has to do with the scope of an *individual criminal defendant's* Sixth Amendment right to be judged impartially. The Court's efforts to reconcile its decision with *McDonald*,

_____

[11] The majority's reliance on footnote 3 of *Warger*, *ante,* at 12–13, is unavailing. In that footnote, the Court noted that some "cases of juror bias" might be "so extreme" as to prompt the Court to "*consider* whether the usual safeguards are or are not sufficient to protect the integrity of the process." 574 U. S., at ___–___, n. 3 (slip op., at 10–11, n. 3) (emphasis added). Considering this question is very different from adopting a constitutionally based exception to long-established no-impeachment rules.

[12] In addition, those cases did not involve a challenge to a long-established evidence rule. As such, they offer little guidance in performing the analysis required by this case.

*Tanner*, and *Warger* illustrate the problem. The Court writes that the misconduct in those cases, while "troubling and unacceptable," was "anomalous." *Ante,* at 15. By contrast, racial bias, the Court says, is a "familiar and recurring evil" that causes "systemic injury to the administration of justice." *Ante,* at 15–16.

Imagine two cellmates serving lengthy prison terms. Both were convicted for homicides committed in unrelated barroom fights. At the trial of the first prisoner, a juror, during deliberations, expressed animosity toward the defendant because of his race. At the trial of the second prisoner, a juror, during deliberations, expressed animosity toward the defendant because he was wearing the jersey of a hated football team. In both cases, jurors come forward after the trial and reveal what the biased juror said in the jury room. The Court would say to the first prisoner: "You are entitled to introduce the jurors' testimony, because racial bias is damaging to our society." To the second, the Court would say: "Even if you did not have an impartial jury, you must stay in prison because sports rivalries are not a major societal issue."

This disparate treatment is unsupportable under the Sixth Amendment. If the Sixth Amendment requires the admission of juror testimony about statements or conduct during deliberations that show one type of juror partiality, then statements or conduct showing any type of partiality should be treated the same way.

### B

Recasting this as an equal protection case would not provide a ground for limiting the holding to cases involving racial bias. At a minimum, cases involving bias based on any suspect classification—such as national origin[13] or

---

[13] See *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 440

religion[14]—would merit equal treatment. So, I think, would bias based on sex, *United States* v. *Virginia*, 518 U. S. 515, 531 (1996), or the exercise of the First Amendment right to freedom of expression or association. See *Regan* v. *Taxation With Representation of Washington*, 461 U. S. 540, 545 (1983). Indeed, convicting a defendant on the basis of any irrational classification would violate the Equal Protection Clause.

Attempting to limit the damage worked by its decision, the Court says that only "clear" expressions of bias must be admitted, *ante*, at 17, but judging whether a statement is sufficiently "clear" will often not be easy. Suppose that the allegedly biased juror in this case never made reference to Peña-Rodriguez's race or national origin but said that he had a lot of experience with "this macho type" and knew that men of this kind felt that they could get their way with women. Suppose that other jurors testified that they were certain that "this macho type" was meant to refer to Mexican or Hispanic men. Many other similarly suggestive statements can easily be imagined, and under today's decision it will be difficult for judges to discern the dividing line between those that are "clear[ly]" based on racial or ethnic bias and those that are at least somewhat ambiguous.

## IV

Today's decision—especially if it is expanded in the ways that seem likely—will invite the harms that no-impeachment rules were designed to prevent.

First, as the Court explained in *Tanner*, "postverdict scrutiny of juror conduct" will inhibit "full and frank dis-

––––––––––

(1985).

[14] See, *e.g.*, *United States* v. *Armstrong*, 517 U. S. 456, 464 (1996); *Burlington Northern R. Co.* v. *Ford*, 504 U. S. 648, 651 (1992); *New Orleans* v. *Dukes*, 427 U. S. 297, 303 (1976) (*per curiam*).

cussion in the jury room."  483 U. S., at 120–121; see also
*McDonald*, 238 U. S., at 267–268 (warning that the use of
juror testimony about misconduct during deliberations
would "make what was intended to be a private delibera-
tion, the constant subject of public investigation—to the
destruction of all frankness and freedom of discussion and
conference").  Or, as the Senate Report put it: "[C]ommon
fairness requires that absolute privacy be preserved for
jurors to engage in the full and free debate necessary to
the attainment of just verdicts.  Jurors will not be able to
function effectively if their deliberations are to be scruti-
nized in post-trial litigation."  S. Rep., at 14.

Today's ruling will also prompt losing parties and their
friends, supporters, and attorneys to contact and seek to
question jurors, and this pestering may erode citizens'
willingness to serve on juries.  Many jurisdictions now
have rules that prohibit or restrict post-verdict contact
with jurors, but whether those rules will survive today's
decision is an open question—as is the effect of this deci-
sion on privilege rules such as those noted at the outset of
this opinion.[15]

Where post-verdict approaches are permitted or occur,

---

[15] The majority's emphasis on the unique harms of racial bias will not
succeed at cabining the novel exception to no-impeachment rules, but it
may succeed at putting other kinds of rules under threat.  For example,
the majority approvingly refers to the widespread rules limiting attor-
neys' contact with jurors.  *Ante*, at 17–18.  But under the reasoning of
the majority opinion, it is not clear why such rules should be enforced
when they come into conflict with a defendant's attempt to introduce
evidence of racial bias.  For instance, what will happen when a lawyer
obtains clear evidence of racist statements by contacting jurors in
violation of a local rule? (Something similar happened in *Tanner*.  483
U. S., at 126.)  It remains to be seen whether rules of this type—or
other rules which exclude probative evidence, such as evidentiary
privileges—will be allowed to stand in the way of the "imperative to
purge racial prejudice from the administration of justice."  *Ante*, at 13.

there is almost certain to be an increase in harassment, arm-twisting, and outright coercion. See *McDonald, supra*, at 267; S. Rep., at 14 (explaining that a laxer rule "would permit the harassment of former jurors by losing parties as well as the possible exploitation of disgruntled or otherwise badly-motivated ex-jurors"); 350 P. 3d, at 293. As one treatise explains, "[a] juror who reluctantly joined a verdict is likely to be sympathetic to overtures by the loser, and persuadable to the view that his own consent rested on false or impermissible considerations, and the truth will be hard to know." 3 C. Mueller & L. Kirkpatrick, Federal Evidence §6:16, p. 75 (4th ed. 2013).

The majority's approach will also undermine the finality of verdicts. "Public policy requires a finality to litigation." S. Rep., at 14. And accusations of juror bias—which may be "raised for the first time days, weeks, or months after the verdict"—can "seriously disrupt the finality of the process." *Tanner, supra*, at 120. This threatens to "degrad[e] the prominence of the trial itself" and to send the message that juror misconduct need not be dealt with promptly. *Engle* v. *Isaac*, 456 U. S. 107, 127 (1982). See H. R. Conf. Rep. No. 93–1597, at 8 ("The Conferees believe that jurors should be encouraged to be conscientious in promptly reporting to the court misconduct that occurs during jury deliberations").

The Court itself acknowledges that strict no-impeachment rules "promot[e] full and vigorous discussion," protect jurors from "be[ing] harassed or annoyed by litigants seeking to challenge the verdict," and "giv[e] stability and finality to verdicts." *Ante,* at 9. By the majority's own logic, then, imposing exceptions on no-impeachment rules will tend to defeat full and vigorous discussion, expose jurors to harassment, and deprive verdicts of stability.

The Court's only response is that some jurisdictions already make an exception for racial bias, and the Court

detects no signs of "a loss of juror willingness to engage in searching and candid deliberations." *Ante,* at 19. One wonders what sort of outward signs the Court would expect to see if jurors in these jurisdictions do not speak as freely in the jury room as their counterparts in jurisdictions with strict no-impeachment rules. Gathering and assessing evidence regarding the quality of jury deliberations in different jurisdictions would be a daunting enterprise, and the Court offers no indication that anybody has undertaken that task.

In short, the majority barely bothers to engage with the policy issues implicated by no-impeachment rules. But even if it had carefully grappled with those issues, it still would have no basis for exalting its own judgment over that of the many expert policymakers who have endorsed broad no-impeachment rules.

## V

The Court's decision is well-intentioned. It seeks to remedy a flaw in the jury trial system, but as this Court said some years ago, it is questionable whether our system of trial by jury can endure this attempt to perfect it. *Tanner*, 483 U. S., at 120.

I respectfully dissent.